MARY CHARLOTTE, Respondent, *v.* GABRIEL S. CHOUTEAU, Appellant.

*Evidence—Foreign Law.*—The existence of a foreign law is a matter of fact for the jury. If a written law be proved, it is the duty of the court to construe it and instruct the jury as to its meaning and effect.

*Practice—Change of Venue.*—It is not sufficient, to authorize a change of venue, that the community are prejudiced against the cause of the applicant; the prejudice must be against him.

*Practice—Trial.*—Where the jury are to pass upon the existence of a foreign law, it is proper to read to them from printed books of decisions and history, as evidence of what the law was.

*Appeal from St. Louis Circuit Court.*

This was an action of trespass, instituted for the purpose of determining the right of the plaintiff below, appellee here, to freedom. The cause has been repeatedly in this court on former occasions.

Before the case was reached for trial, ten days, indeed, before that day, the defendant filed the following affidavit, and moved the court to grant him a special *venire*, for the reasons therein disclosed:

" Gabriel S. Chouteau comes and says that a jury selected from the jury list, in the hands of the jury commissioner, will not be free from prejudices, which preclude a fair trial in a cause like the present; that a jury collected from the city will necessarily include many who, from prejudices of birth and education, are not a fair or unprejudiced jury for the determination of the issues in this cause, and that he cannot safely go to trial without the granting to him of a special writ of *venire facias* for the summoning of a jury from the country; that he cannot say that the minds of the people and juries within the city are prejudicial against himself, but that he verily believes that they are prejudiced against his side of the issue, presented in the above entitled cause, and that the case cannot be fairly tried by a jury selected as the general law provides."

This was duly verified by affidavit, and submitted to the court on the 1st of March, 1859. The court overruled the motion on the 3d of March.

The case was reached for trial on the 9th of March, 1859. When it was called, the defendant Chouteau moved the court to hear and consider the testimony in the cause relative to the legal existence of slavery in Canada at the time when the ancestress of the plaintiff was in that country prior to the empannelling of a jury, and, apart from the jury so to be empannelled, to try the facts of the cause properly cognizable by a jury. This motion was declared to be made on the ground that the question, whether slavery then existed

in Canada, was a question to be determined as a matter of law by the court. This motion the court overruled.

To the overruling of these motions the defendant duly excepted at the time.

The court directed all the testimony in the cause to be given to the jury to be empannelled, saying that the court would give instructions to the jury on the subject of it. To the giving of the evidence on the question of the legal existence of slavery in Canada from 1760 to 1793 to the jury at all, the defendant objected and excepted to the opinion of the court allowing that course.

The defendant asked the following instructions, all of which were refused:

In this cause, the plaintiff asserts her freedom on the following ground, viz: she claims that "her mother, Rose, was a negress, and was born in Montreal, in the Province of Quebec about the year 1768, and that her mother was free, because negro slavery had no legal existence in the Province of Quebec, at the time of her birth. On the other hand, the defendant says that negro slavery did legally exist in the Province of Quebec at the time of the birth of Rose and as long as she remained there ; that Rose was lawfully held as a slave in Canada, and brought to St. Louis, where the ancestress of defendant purchased her."

These being the conflicting positions of the parties, the court declares the law to be as follows :

1. That the institution of slavery did have a legal existence, and was sanctioned by the law of the land in the country called the Province of Quebec, which includes Montreal, from 1760 to 1793.

2. That the evidence shows that Rose was held as a slave, and sold as a slave in Montreal, within the Province of Quebec, between 1760 and 1791, and the presumption is, that she was legally so held and sold. If the jury believe this evidence, they must find for the defendant.

3. That the institution of negro slavery did have a legal

existence, and was sanctioned by the law of the land, in the country called the Province of Quebec, which includes Montreal, at all times from 1760 to 1793; and if during that period Rose was held as a slave in Canada, the presumption is that she was legally so held.

4. In this case the jury is not entitled to indulge any presumption in favor of plaintiff. If any point be left obscure or not cleared up in the testimony, the defendant is entitled to the benefit of the doubt thence arising.

The court then instructed the jury as follows:

1. If negro slavery existed by virtue of the laws and ordinances of the French Government in Canada prior to the acquisition of that country by the English, and if the articles of capitulation, the treaty of cession, the acts of Parliament of 1774 and 1790, and the king's proclamation of 1763, be correct copies of the genuine documents, then negro slavery was sanctioned and permitted by law in the country called the Province of Quebec, which includes Montreal, at all times from the year 1760 to the year 1793. And if you find that plaintiff Charlotte is the daughter of Rose, and that Rose was a negress, and was a slave in Montreal at any time between 1760 and 1793, the plaintiff is not entitled to a verdict in her favor upon such ground.

2. Although you may believe that Rose was the mother of plaintiff, and was taken to and held as a slave at Prairie du Chien, in the Northwest Territory, from 1791 to 1793, those facts do not authorize you to render a verdict in favor of the plaintiff in this case.

3. If you find that Rose was a free person in Canada, and that while she was free, either in Canada or elsewhere, she gave birth to the plaintiff, and at the commencement of this suit the defendant held her as his slave, as alleged, you should find for the plaintiff.

4. Whether Rose was a free person in Canada, is a question for the jury to decide from the evidence on the trial, under the instructions given you by the court.

*T. T. Gantt*, for appellant.

I. It was error in the court to refuse a special *venire* to the defendant below.

It will be seen, by reference to the statute, (2 R. C. 1855, p. 1560, § 13,) that " no change of venue in civil cases shall be allowed from any court in St. Louis county to any other county."

II. But appellant prays the court to pronounce upon the instructions prepared and offered by the defendant, and refused by the court, as well as upon the refusal by the court to decide, as a matter of law, upon the question of the legal existence of slavery in Canada down to 1793.

It was decided in 1857, upon the documentary evidence then presented to the court on that subject, and the same is before it now, that negro slavery did exist in Canada from 1760 to 1793. But the Circuit Court, at the recent trial, told the jury that if such and such facts were found, then they must find that slavery existed, &c., &c.

The vice of the instruction is, that it was the province of the court to ascertain and declare the law on this subject to the jury, instead of leaving it to be decided by the jury; and its refusal to do this is error.

This matter received such full discussion at the hands of the accomplished judge who wrote the opinion reported 25 Mo. p. 465 and following, that it certainly ought to be treated as settled. It will be seen that the doctrine which the Circuit Court adhered to in this cause permitted, or, it may be said, called for, the reading to the jury of numerous opinions of courts distinguished for learning. The defendant excepted to this anomaly (as it seemed to him). The practice has been repeatedly condemned by this court of reading any law book to the jury.

*Garesché & Cobb*, for respondent.

I. That the common law of England does not tolerate slavery. (Smith v. Gould, 2 Ld. Raym. 1274.) *Per totam curiam:*

"The common law takes no notice of negroes being different from other men. By the common law, no man can have a property in another, but in special cases, as in a villein, but even in him, not to kill him; so in captives taken in war, but the taker cannot kill them, but may sell them, to ransom them. There is no such thing as a slave by the law of England." (11 In. 1762, Shanley v. Harvey; 1-2 Eden, p. 78, § 27, A. L. 1761; 20 How. State Tri. 82 — Somerset case.)

The state of slavery is of such a nature that it is incapable of being introduced on any reasons, moral or political, but only by positive law, which preserves its force long after the reasons, occasion and time itself which it created, are erased from memory. It is so obvious, that nothing can be offered to support it but positive law. (3 Bosauq. & Pul. 70.)

By the law of England, slavery is prohibited in the country. (Forbes v. Cochrane et al. 462; dic. Jus. Holroyd; 1 Black. Com. 424.)

II. That the law of England, by the king's proclamation, superseded the Canadian law. (Smith v. Brown & Cooper, 2 Salk. 666.)

The laws of England do not extend to Virginia; being a conquered country, their law is what the king pleases. (Paine v. Lisle, 1 Amb. 75.) Lord Hardwick decides: All our colonies are subject to the laws of England, although, as to some purposes, they have laws of their own. (Forbes v. Cochrane, 2 B. & C. 462.) In the case of a conquered country, indeed, the old laws would prevail until altered by the king in council. (Marguerite v. Chouteau, 3 Mo. 388; dic. Jud. Tompkins.)

By the law of nations, the inhabitants of a ceded, and even of a conquered province, retain their ancient municipal regulations until they are abrogated by the act of the new sovereign, and their property, too, until they forfeit it by some criminal act. (Donegani v. Donegani, 3 Knapp's P. C. 85; Pepsom v. Riera, 151.)

That the abolition of slavery by the introduction of Eng-

lish law was no violation of the treaty guaranteeing to the Canadians the rights of persons and of property. (Merry v. Tiffin, 1 Mo. 520 ; Harry et al. v. Decker et al. Walker's Miss. 36.)

BATES, Judge, delivered the opinion of the court.

1. We cannot say that the court below erred in refusing to grant a special *venire* upon the application of the defendant. The application did not come fully up to the requirements of the act of the General Assembly, and if the court below had any power to grant the *venire* in such case, that power was to be exercised at its discretion, and nothing appears in the record to authorize us to say that the discretion was exercised unwisely.

2. The court did not err in refusing the application of the defendant, that the court should hear and consider the testimony in the cause relative to the legal existence of slavery in Canada at the time when the ancestress of the plaintiff was in that country, prior to the empannelling of a jury. The existence of a foreign law was a question of fact, to be tried by a jury. If a written law had been proved, it would have been the duty of the court to construe it, and instruct the jury as to its meaning and effect. This we understand to have been decided by this court when the case was here in 1857.

3. The instructions given by the court were correct. The first and fourth have already been approved by this court. The second was for the advantage of the defendant. No objection is made to the third.

4. The first and third instructions moved by the defendant were properly refused, because they required the court to declare the existence of a law, by inference from facts in evidence. If all the evidence had been documentary, possibly it might have authorized such inference ; but there was also parol testimony, of the truth and effect of which the jury was the proper judge. The second instruction would necessarily include the same declaration. It required the jury to

find for the defendant, if they should believe that Rose was held as a slave in the Province of Quebec between 1760 and 1791. In so requiring, the court would decide that such slavery was lawful.

5. The plaintiff read to the jury from printed books a number of decisions of cases by English courts, and also an extract from Garneau's History of Canada, and also from a printed book purporting to contain the census of Canada for the years 1719, 1721 and 1724. The defendant objected to them, because they were read to the jury, and not to the court. The jurors were the triers of the fact of the existence of slavery by law, and therefore the evidence was properly addressed to them. The issue tried by the jury was of a character very rarely brought before juries, and it therefore appears strange that they are called upon to hear and weigh as testimony matters which are usually submitted to the court.

6. The most plausible objection to the judgment is, that it was founded upon a verdict which was rendered against the weight of the evidence. Notwithstanding that we might believe that the verdict should have been rendered for the defendant, yet the practice is so well established, not to reverse a judgment because the verdict appears to have been rendered against the weight of evidence, that we will not, for that cause, interfere in this case.

Judgment affirmed. Judge Bay concurs.

The following is the opinion of Judge Dryden, dissenting:

"In my opinion, the defendant's application for a *venire* for a country jury came within the meaning and intention of the General Assembly.

"The end of the statute is a fair and impartial trial. This cannot be attained upon the plaintiff's construction of the statute. The plaintiff's objection is, that the law provides for a *venire* only when prejudice exists against the person, whereas the application shows the existence of prejudice, not against the defendant, but against his side of the issue.

What matters it to the defendant whether it be against him or his cause? The result to him is the same in the one case as in the other; in either case he fails to get what every litigant is entitled to — a fair and impartial trial. The two cases come alike within the mischief; why not within the remedy?

"I concur in the opinion of the other judges, that the question of what was the law of Canada was a question of fact for the jury, under proper instructions from the court; but I think the first instruction given of the court's own motion was erroneous in this: that while it properly referred to the jury the question whether the law of Canada, under French dominion, permitted negro slavery, it improperly omitted to inform them what facts, if any, proved by the evidence, would constitute such law. On this point, (so far as relates to the law under the French,) the jury were left without any guide, each to determine for himself what would or would not constitute the law. For these reasons, I think the judgment ought to be reversed."